IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **MURRAY ENERGY HOLDINGS COMPANY**, *et al.*, | : : : |
| **Plaintiffs,** | : : |
| v. | : : |
| **MERGERMARKET USA, INC**, *et al.*, | : : |
| **Defendants.** | : |

Case No. 2:15-CV-2844

JUDGE ALGENON L. MARBLEY

Magistrate Judge Kemp

## <u>OPINION & ORDER</u>

This matter is before the Court on the Motion to Dismiss of Defendants Mergermarket USA Inc., Mergermarket (U.S.) Ltd., and Debtwire Inc. (collectively, "Mergermarket"). (Doc. 13.) For the reasons that follow, the Court **GRANTS** the Motion to Dismiss for failure to state a claim upon which relief can be granted.

### I. BACKGROUND

#### A. Factual Background

Murray Energy Corporation ("Murray Energy") is a privately-held bituminous coal company headquartered in St. Clairsville, Ohio.[1] (Am. Compl., Doc. 6 at ¶ 10.) Mergermarket is a media company that provides corporate and financial news. (*Id.* at ¶ 11.) Mergermarket sells a subscription-based financial service known as Debtwire, which discloses to subscribers the earnings performance of privately-held companies, such as Plaintiffs, that have issued debts to investors. (*Id.* at ¶ 15.)

---

[1] A second Plaintiff in the suit, Murray Energy Holdings Company, is identified only as "a privately-held Delaware corporation with its principal place of business in St. Clairsville, Ohio." (Doc. 6 at ¶ 1.)

1

A dispute between the parties arose in April 2013 when Defendants allegedly obtained certain confidential financial and business information relating to Plaintiffs through sources that had a contractual or fiduciary duty not to disclose the information. (*Id.* at ¶ 16.) Through a series of telephone conversations and emails, Murray Energy told Defendants that the publication of this information would constitute misappropriation of its confidential trade secret information. (*Id.* at ¶ 18.) On April 3, 2013, however, Defendants published the information in an electronic message to Debtwire subscribers. (*Id.* at ¶ 19.) Murray Energy filed a complaint against Defendants in the Belmont County Court of Common Pleas on April 5, 2013. The action was subsequently removed to this Court and resolved by a confidential settlement agreement on January 28, 2014. (*Id.* at ¶ 20; *Murray Energy Corp. v. Mergermarket US, Ltd.*, No. 2:13-cv-438 (S.D. Ohio Jan. 28, 2014).) The settlement agreement provided that for four years, Mergermarket would send an email to the Chief Operating Officer, Senior Vice President, and Assistant General Counsel of Murray Energy advising them of the information it was about to publish and provide Murray Energy four hours to object. (Settlement and Mutual Release Agreement, Doc. 14-1 at 3.) If during the four-hour period Murray Energy notified Mergermarket that it intended to take legal action to prevent the information in question, Mergermarket would agree not to publish the information for 24 hours. (*Id.*)

Between April 2013 and August 2014, Murray Energy advised Defendants several times that its financial information was confidential. (Doc. 6 at ¶ 21.) On August 14, 2015, Murray Energy uploaded a PowerPoint presentation (the "August Lender PowerPoint") to a secure site in preparation for a call with its public debt holders (the "August Lender Call"). (*Id.* at ¶ 22.) The presentation was designated "confidential" and included Plaintiffs' actual and project adjusted

EBITDA,[2] capital expenditure, production, sales volume, cost of sales, price realizations, liquidity, and cash reserves. (*Id.*) Only persons who had signed a confidentiality agreement with Murray Energy were permitted to access the August Lender Power Point. (*Id.* at ¶ 23.) Thirty minutes after the August Lender Call ended, Defendants notified Murray Energy that they intended to publish the alleged trade secret information disclosed in the August Lender Presentation. (*Id.* at ¶ 24.) Murray Energy notified Defendants by email that they objected to said publication. (*Id.* at ¶ 26.) Three days later, Defendants published the information on Debtwire's website (the "August 17 article"). (*Id.* at ¶ 27.) The article reported financial information about Murray Energy including revenue, adjusted EBITDA and projected EBITDA, cash balance, total liquidity, and coal sales. (*Id.* at Ex. C.)

On August 18, 2015, Defendants notified Murray Energy that they intended to publish information from the August Lender Presentation that was not included in the August 17 Article. (*Id.* at ¶ 28.) Murray Energy objected via email that same day, and sent another email the following day reiterating its objection. (*Id.* at Ex. D.) On August 19, 2015, Defendants published additional information on the Debtwire website (the "August 19 article"). (*Id.* at ¶ 30.) The website reported on much of the same financial information as the August 17 article and noted that Murray Energy could be at risk of bankruptcy. (*Id.* at Ex. E.)

### B. Procedural History

Plaintiffs filed a complaint against Defendants in the Belmont County Court of Common Pleas on August 18, 2015 and an amended complaint on September 1, 2015. (*See* Docs. 1-1, 1-2.) Plaintiffs brought claims under Ohio law for: (1) misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act, Ohio Revised Code §§ 1333.61-69 ("OUTSA"); (2) tortious

---

[2] EBITDA, which stands for "earnings before interest, taxes, depreciation, and amortization," is a commonly reported measure of a company's pre-tax earnings calculated on a cash basis.

3

interference with contract; (3) civil conspiracy; and (4) a declaratory judgment that publication of any other information from the August Lender Presentation by Defendants will constitute an additional violation of OUTSA.  (Doc. 6 at ¶¶ 32-62.)  Plaintiffs request compensatory and punitive damages and attorneys' fees.  (*Id.* at 13-14.)

On September 18, 2015, Defendants removed the action to this Court.  (Doc. 1.)  Plaintiffs filed an amended complaint on September 21, 2015.  (Doc. 6.)  On October 26, 2015, Defendants filed a motion to dismiss the amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Doc. 13.)  The motion is fully briefed and ripe for review.

## II.    STANDARD OF REVIEW

The Court may dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations."  *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005).  Thus, the Court must construe the complaint in the light most favorable to the non-moving party.  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).  The Court is not required, however, to accept as true mere legal conclusions unsupported by factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Generally, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The allegations need not be detailed but must "give the defendant fair notice of what the claim is, and the grounds upon which it rests."  *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  In short, a complaint's factual allegations "must be enough to raise a right to relief above the speculative

level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

### III. ANALYSIS

#### A. Misappropriation-of-Trade-Secrets Claim

To prevail on an OUTSA claim, a plaintiff must show "by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008). OUTSA defines a trade secret as:

> Information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). Defendants maintain that Plaintiffs have not alleged the existence of a trade secret because they cannot show that the financial information in question derives independent economic value from not being generally known or that the information was subject to reasonable efforts to maintain its secrecy.

The Ohio Supreme Court has adopted the following six factors for consideration in determining whether a plaintiff has shown the existence of a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the

> savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (1997). The alleged trade secret information, as identified by Plaintiffs in their amended complaint, includes: "certain confidential and proprietary business information, business plans, financial information and trade secrets regarding Plaintiffs, including without limitation their actual and projected adjusted EBITDA, [capital expenditure], production, sales volume, cost of sales, price realizations, liquidity and/or cash reserves." (Doc. 6 at ¶ 34.)

An inquiry as to "whether information constitutes a trade secret is a highly fact-specific inquiry." *Wellington Res. Grp. LLC v. Beck Energy Corp.*, No. 2:12-cv-104, 2013 WL 5325911, at *5 (S.D. Ohio Sept. 20, 2013); *see also Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 862 (Ohio 1999) (noting that the question of whether information is a trade secret is a question for the trier of fact). Nevertheless, "[c]onclusory statements as to trade secret factors without supporting factual evidence are insufficient to meet the burden of establishing trade secret status." *Arnos v. MedCorp., Inc.*, No. L-09-1248, 2010 WL 1730139, at *3 (Ohio Ct. App. Apr. 30, 2010) (citing *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 381 (Ohio 2000) (per curiam)).

*1. Independent Economic Value*

Defendants maintain that although the statute specifies that "financial information" can constitute a trade secret, the specific financial information at issue here does not have independent economic value and, therefore, Plaintiffs cannot state a claim for trade-secret misappropriation. Furthermore, they argue that the fact that the information is routinely

6

disclosed suggests that it does not have a value in not being known.  The Court will consider these arguments in turn.

Courts have generally held that trade secret law does not protect "information that is merely momentary or ephemeral" because it quickly becomes stale.  *Plain Dealer*, 687 N.E.2d at 675.  One court, applying Ohio law, characterized a trade secret as:

> a process or device for continuous use in the operation of the business.  Generally, it relates to the production of goods, as for example, a machine or formula for the production of an article.  It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list of catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

*Apex Tool Grp., LLC v. DMTCO, LLC*, No. 3:13-CV-372, 2014 WL 6748344, at *12 (S.D. Ohio Nov. 26, 2014).  The "mere existence of a confidentiality agreement" does not, standing alone, "support a trade secret claim for documents referred to in such an agreement."  *Plain Dealer*, 687 N.E.2d at 673; *see also id.* ("[D]ocuments that pertain to draft agreements, negotiations, or other events ephemeral in the conduct of the business are not trade secrets.").

This case is readily distinguishable from other cases Plaintiffs cite where courts have declined to dismiss trade-secret claims.  In those cases, the plaintiffs alleged trade secrets that were based on information about operations or processes, pricing methods, or business plans.  *See, e.g.*, *Exal Corp. v. Roeslein & Assocs.*, No. 4:12-cv-1830, 2013 WL 6843022, at *3 (N.D. Ohio Dec. 27, 2013) (declining to dismiss a trade-secret claim based on financial projections and cost structure information about a new building project, the identity and method of use of certain raw materials in construction projects, and information about the operating procedures of the plaintiff's equipment); *Wellington Res. Grp.*, 2013 WL 5325911, at *5  (finding that allegations regarding the misappropriation of confidential proprietary information relating to business opportunities, including a planned sale to another company, stated a trade-secrets claim under the

7

OUTSA); *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 729 (N.D. Ohio 1999) (holding that allegations that a confidential technology used in a plaintiff's bending and tempering system was a trade secret were sufficient to survive a motion to dismiss, but granting the motion to dismiss the trade-secret claim on another ground).[3]

The best case in support of Plaintiffs' position may be *Rain CII Carbon, LLC v. Kurczy*, Case No. 12-2014, 2012 WL 3577534 (E.D. La. Aug. 20, 2012), which was brought against Mergermarket and Debtwire for publication of similar financial information to that at issue here. There, the court concluded that the financial information that Debtwire published "arguably" constituted trade secrets but ultimately denied a preliminary-injunction motion because it concluded that the injunction would constitute a prior restraint on speech. But the Court declines to adopt the analysis of the *Kurczy* court with regard to whether the gross profit margins of the plaintiff there were a trade secret, given that the opinion primarily concerns whether the requested injunction was an unconstitutional prior restraint. *See* 2012 WL 3577534, at *3-6. Moreover, unlike in *Kurczy*, where the court found that the plaintiff had presented evidence that its gross margins were a trade secret, and that that financial information derived economic value from not generally being known to the public,[4] Plaintiffs' amended complaint here consists

---

[3] The parties spill a fair amount of ink debating whether Murray Energy's status as a private company weighs in favor of finding that this financial information could plausibly be considered a trade secret that derives independent economic value from not being known to those who could benefit from its use, given that the SEC requires disclosure of this exact type of financial information for publicly traded companies. The Court agrees that even though Murray Energy is a private company, the fact that this type of information is routinely disclosed by publicly traded companies undermines Plaintiffs' arguments. After all, it would make little sense for the SEC to require regular disclosure of information that would constitute trade secrets in a different context.

[4] The *Kurczy* court considered that matter at the preliminary-injunction stage and therefore held an evidentiary hearing in which the parties presented evidence in order for the court to determine the parties' likelihood of success on the merits. *Id.* at *2. Although the procedural posture here is different because the Court must take Plaintiffs' factual allegations as true at the motion-to-dismiss stage, *Total Benefits Planning Agency*, 552 F.3d at 434, the Court concludes that

virtually entirely of "legal conclusions[s] couched as . . . factual allegations[s]." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). (*See* Doc. 6 at ¶¶ 33-40.) Plaintiffs fail to provide any factual specificity regarding the "confidential and proprietary business information, business plans, financial information, and trade secrets, including without limitation their actual and projected adjusted EBITDA, capex, production, sales volume, cost of sales, price realizations, liquidity, and/or cash reserves." (*Id.* at ¶ 34.) Instead, they merely recite the elements of a cause of action under the OUTSA, which does not suffice to state a claim for relief. *See Twombly*, 550 U.S. at 555. Plaintiffs make no factual allegations whatsoever relating to the majority of the *Plain Dealer* factors, such as who has access to the information within the company, what specific benefits inure to the company by keeping the information confidential, and how much effort or money is expended in keeping the information secret or would be expended by competitors who attempted to duplicate the information. *See Plain Dealer*, 687 N.E.2d at 672.

As to the first *Plain Dealer* factor—the extent to which the information is known outside the business—Defendants argue that the financial information in question has no independent economic value because Plaintiffs have disclosed, and indeed routinely allow the disclosure of, this information. The Confidentiality Agreement that purportedly reveals this disclosure reads, in relevant part, as follows:

> The Confidential Information is confidential and I agree that I will use such information solely for the purpose of administrating and evaluating my employer's investment or potential investment in [Murray Energy]. I agree to keep such Confidential Information strictly confidential, and not disclose such information to any other person or third party in any manner, except to the extent that such disclosure of such information: 1) has been previously consented to in writing by [Murray Energy]; 2) is required by applicable law,

---

Plaintiffs' claims fail here not because they have failed to introduce evidence that the alleged trade secrets have independent economic value, but because they do not plead facts to show that the trade secrets *plausibly* have independent economic value. *See Twombly*, 550 U.S. at 556.

9

> regulatory, or legal process; or 3) is made to the directors, officers, employees, affiliates, financing parties or advisors of my employer and to any representatives of such advisors . . . solely for the purpose of administrating and evaluating investments in [Murray Energy].

(Doc. 6, Ex. A.)

The Court agrees that Murray Energy cannot plausibly allege that this financial information allows it to gain a competitive advantage when, in fact, it routinely discloses the information to potential lenders and investors. And in fact, investors are the very audience to which Debtwire caters. (*See* Doc. 6 at ¶ 13 ("Debtwire's subscribers include institutional investors, financial and legal advisors and others who follow these markets. Upon information and belief, the annual subscription fee to Debtwire can exceed more than $100,000.00 for some subscribers.").) It is implausible for Murray Energy to argue that this financial information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Ohio Rev. Code § 1333.61(D)(1). Therefore, Plaintiffs have failed to state a trade-secret claim. In the alternative, the Court also finds that Plaintiffs' OUTSA claim fails to allege efforts to maintain the secrecy of the trade secrets and also cannot survive a motion to dismiss on that ground.

## 2. *Efforts to Maintain Secrecy*

The Sixth Circuit has stated that "except where the evidentiary showing of reasonable efforts [to maintain secrecy] could not conceivably support a judgment in favor of the plaintiff, the reasonableness of the efforts is a question for the trier of fact." *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 303 (6th Cir. 2008). Plaintiffs assert that their allegations that they required participants on the Lender Call to sign a Confidentiality Agreement, uploaded the Lender PowerPoint to a secure website, and designated the Lender Presentation as "confidential" are

sufficient at the motion-to-dismiss stage to show reasonable efforts to maintain the secrecy of their financial information. (Doc. 15 at 17-18.)

Defendants counter that these alleged efforts constitute an insufficient showing of the second part of the test to show the existence of a trade secret. Defendants argue that because the Agreement explicitly allows disclosure to prospective investors, who would not be required to sign a confidentiality agreement, Plaintiffs have not taken reasonable steps to protect this information. The Court agrees. As another court, applying Ohio law, has found, "disclosure . . . absent a confidential agreement or understanding, will destroy any protection of that information as a trade secret." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 986 (N.D. Ohio 2008) (citing *R&R Plastics, Inc. v. F.E. Meyers Co.*, 637 N.E.2d 332, 341 (Ohio Ct. App. 1993)).

Moreover, in the past, Murray Energy has even disclosed to the *general public* financial information like that at issue here; for instance, in a March 16, 2015 press release announcing its acquisition of Foresight Energy LP, Murray announced its 2014 adjusted EBITDA of $713 million.[5] (Doc. 14-7 at 3.) And just three months before the events at issue here, in May 2015, Defendants notified Murray Energy (pursuant to the terms of the earlier settlement agreement) that they intended to publish numbers including Murray Energy's adjusted EBITDA, capital expenditures, liquidity, sales per ton, cost of sales, price realization, and leverage. (*See* Doc. 14-2 at 3-4.) Murray Energy acquiesced in the publication of this information with the inclusion of Murray's Assistant General Counsel's suggested language that the EBITDA calculation might not be analogous to EBITDA figures for publicly-traded coal companies. (*Id.* at 2.) Although

---

[5] Where, as here, the documents are offered to establish their contents rather than the truth of the statements therein, the Court may properly take judicial notice of public records such as SEC filings in a Rule 12(b)(6) motion. *New England Health Care Emp. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *Shaw v. City of Dayton*, No. 3:13-cv-210, 2016 WL 1732869, at *3 n. 2 (S.D. Ohio May 2, 2016). The Court does so here.

the parties clarified in their communications that the agreement was a settlement and could not be used in future disputes between the parties, the fact that this information was published shows that this type of information cannot satisfy the *Plain Dealer* factors because it was widely known outside the company, Murray Energy did not take steps to ensure its secrecy, and it would not take significant time and expense to acquire and duplicate this information. *See Plain Dealer*, 687 N.E.2d at 672.

Murray Energy's allegations do not state a claim for a violation of the OUTSA and, therefore, the Court **GRANTS** Defendants' motion to dismiss the trade-secrets claim. Although this claim will be dismissed for failure to allege the existence of a trade secret, the Court is also mindful—especially since neither party has cited to a successful trade-secret action that arose out of the media's disclosure of supposedly confidential information—that the First Amendment might provide an alternate basis for dismissal of this claim, because the Supreme Court has held that when a media organization "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979).[6]

### B. Tortious-Interference and Civil-Conspiracy Claims

Defendants argue that both the tortious-interference and civil-conspiracy claims are preempted by OUTSA, which states that the Act "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code 1333.67(A). Courts have generally found tort claims to be preempted when they "are

---

[6] The tortious-interference and civil-conspiracy claims also most likely fail to withstand First Amendment scrutiny. The Court, however, will dismiss those claims on alternate grounds, as detailed in Section III(B).

12

no more than a restatement of the same operative facts that formed the basis of the plaintiff's statutory claims for trade secret misappropriation." *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 485 (6th Cir. 2015) (internal quotation marks and citation omitted).[7]

Plaintiffs attempt to distinguish these common law tort claims from the OUTSA claim, contending that these claims focus on "*how the misappropriation occurred*" while the OUTSA claims center on "*what Defendants did* with their misappropriation." (Doc. 15 at 19.) They rely on *Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925 (S.D. Ohio 2012), but that case provides no help to them. There, the court found that a claim for conversion was preempted by the OUTSA because that claim rested "entirely on the same operative facts" as the trade-secret claim, that is, that the defendant, a corporation that coordinated paramedical examinations for the insurance industry, wrongfully took the list of names, addresses, and phone numbers of the plaintiffs' business contacts, which the plaintiffs, licensed agents who conducted the medical examination for individual insurance applicants, alleged to be trade secrets. *Id.* at 940-41. The court denied the motion to dismiss the tortious-interference claims, however, finding that those claims were not preempted because they centered on an allegation that the defendant "purposely interfered" with the plaintiffs' business relationships with various insurance agencies "by hindering and/or preventing Plaintiffs from doing business with these relations." *Id.* at 941. Specifically, the plaintiffs alleged that the

---

[7] The Ohio Supreme Court has not addressed the scope of the OUTSA preemption clause. When "state law is unsettled, as in this case, [the Court] must anticipate how the state's supreme court would rule on the issue of state law." *Melson v. Prime Ins. Syndicate, Inc.*, 429 F.3d 633, 636 (6th Cir. 2005). The majority view among jurisdictions that, like Ohio, have adopted the Uniform Trade Secrets Act ("UTSA") is that all common law claims that rely upon the same factual matter as a claim under the UTSA are preempted. *See Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp. 2d 912, 918-19 (N.D. Ohio 2011). Ohio intermediate appellate courts have also adopted this standard. *See id.* at 919. The Court thus presumes that the Ohio Supreme Court would adopt this standard.

13

defendant required independent agent examiners, nurses, and physicians to use a central scheduling office and dictated where, when, and how they completed the contracted paramedical examinations, which prevented individual insurance companies from being able to schedule paramedical exams directly with the plaintiffs.  *Id.*  Although the claims were related, the allegations regarding the interference with contractual relations through the mandated central scheduling office "allege far more than the wrongful use of clients' contact information," and were thus not preempted by the OUTSA.  *Id.*

Here, Plaintiffs' amended complaint asserts that Defendants "intentionally and unjustifiably induced breaches of the Confidentiality Agreement by their sources and/or induced their sources to disclose the Trade Secret Information with knowledge that such disclosure would violate the terms of the Confidentiality Agreement."  (Doc. 6 at ¶ 52.)  In essence, Plaintiffs' tortious-interference claim restates their misappropriation-of-trade-secrets claim, and Plaintiffs' attempt to distinguish the "what" from the "how" here misses the point because Plaintiffs allege the exact same facts to support both claims—that "what" Defendants did was publish Plaintiffs' financial information that they allegedly acquired improperly and "how" they did it was improperly to acquire the information so they could publish it.  The other cases Plaintiffs cite do not help their argument because the plaintiffs in those cases pleaded specific facts to support their arguments that an "independent factual basis" separated their other claims from the OUTSA claims.  *See e.g.*, *Office Depot, Inc. v. Impact Office Prods.*, 821 F. Supp. 2d 912, 921-22 (N.D. Ohio 2011) (noting that the existence of a non-compete provision provided an "independent factual basis" from the OUTSA claim).

As to the civil-conspiracy claim, the Sixth Circuit has noted, in applying Ohio law to find a civil-conspiracy claim preempted by OUTSA, that:

14

> Even though proof of conspiracy requires proving additional facts—a malicious combination of two or more persons causing injury—beyond the underlying unlawful act, the conspiracy claim is dependent on proof of the underlying act—here, misappropriation of trade secrets. [The plaintiff's] conspiracy claim similarly restates the operative facts that would establish [the plaintiff's] claim for misappropriation of trade secrets.

*Stolle Mach. Co.*, 605 F. App'x at 486 (internal citation omitted).

Plaintiffs' amended complaint alleges that Defendants "knowingly, voluntarily and maliciously combined and conspired with one or more of their sources to enable the breaches of the Confidentiality Agreement for the unlawful purpose of acquiring the Trade Secret Information for publication in violation of Ohio law." (Doc. 6 at ¶ 57.)  The underlying unlawful act, as alleged in the amended complaint, was the misappropriation of trade secrets. (*Id.* at ¶ 58.) Accordingly, "[b]y its very allegations, the civil conspiracy claim is specifically linked to the alleged theft of trade secrets, and necessarily rises or falls based on whether the defendant is found to have misappropriated a trade secret." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 967 (M.D. Tenn. 2011) (alterations, citation, and internal quotation marks omitted).  Therefore, the civil-conspiracy claim is preempted by the OUTSA.

As a last-ditch effort to save their common law tort claims, Plaintiffs contend that they are "clearly permitted to plead alternative or even inconsistent claims without being subject to a motion to dismiss." *Lunkenheimer Co. v. Pentair Flow Control Pacific PTY Ltd.*, No. 1:11-cv-824, 2014 WL 4450034, at *5 (S.D. Ohio Sept. 10, 2014).  But courts have rejected this argument as applied to OUTSA claims.  *See Rogers Indus. Prods. Inc. v. HF Rubber Mach., Inc.*, 936 N.E.2d 122, 130 (Ohio 2010) ("This language was intended to prevent inconsistent theories of relief for the same underlying harm and has been interpreted to bar claims that are based solely on allegations of misappropriation of trade secrets or other confidential information."); *Miami Valley Mobile Health Servs.*, 852 F. Supp. 2d at 940.  It would be incongruent to hold that

15

these claims are preempted yet allow them to be pleaded in the alternative.  The Court **GRANTS** Defendants' Motion to Dismiss the tortious-interference and civil-conspiracy claims.

### C.  Declaratory Judgment

Without a colorable claim on any of the other causes of action, Plaintiffs have no basis to seek a declaratory judgment.  *See Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) ("[The Declaratory Judgment Act] does not create an independent cause of action"); *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 7254213, at *13 (S.D. Ohio Nov. 17, 2015).

In the alternative, however, the Court finds that the declaratory judgment claim must be dismissed because it operates as an unconstitutional prior restraint on speech.  Plaintiffs seek a declaratory judgment that "publication of any other information from the August Lender Presentation by Defendants will constitute an additional violation of OUTSA, and will entitle Plaintiffs to further relief as provided by law."  (Doc. 6 at ¶ 62.)  Defendants argue that a declaratory judgment would constitute an unconstitutional prior restraint on their speech.  Alternatively, they contend that this claim fails to present a justiciable controversy as required by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and the Ohio Declaratory Judgment Act, Ohio Revised Code § 2721.02.

A prior restraint is a law "*forbidding* certain communications when issued in advance of the time that such communications are to occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis in original).  Laws that "impose a prior restraint on free speech have been disfavored by the courts as tantamount to censorship and thought control."  *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 506 (6th Cir. 2001) (citing *Near v. Minnesota*, 283 U.S. 697, 713 (1931)).  A party who seeks a prior restraint "carries a heavy burden of showing justification for the imposition of such a restraint."  *McGlone v. Bell*, 681

F.3d 718, 733 (6th Cir. 2012) (quoting *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002)).

Plaintiffs try to characterize their declaratory-judgment claim as one that imposes damages for past speech, not a restraint on future expressive activity. (Doc. 15 at 7-8.) Because they do not seek an order forbidding the publication of material from the August Lender Presentation, they contend that a declaratory judgment would not be a prior restraint because Defendants would be free to publish such material and then pay damages for violating the OUTSA. (*Id.* at 8.) This argument strains the Court's credulity. First, the prior-restraint doctrine does not apply only to injunctions but to all "administrative and judicial orders that block expressive activity before it can occur." *Polaris Amphitheater Concerts*, 267 F.3d at 506. Second, although a declaratory judgment from this Court would not technically be an injunction, by making the further publication of information unlawful, it would operate as such. And any past conduct of Defendants would not justify the imposition of such a declaration that future publication would violate the law when, as here, there are no extraordinary reasons, such as national security, to suppress such publication. *See Near*, 283 U.S. at 716 (noting that a prior restraint may be imposed in an extraordinary situation such as to prevent "publication of the sailing dates of transports or the number and location of troops."). Instead, this is a run-of-the-mill case of unconstitutional prior restraint, illustrating that "where a law sets out primarily to arrest the future speech of a defendant as a result of his past conduct, it operates like a censor, and as such violates First Amendment protections against prior restraint of speech." *Polaris Amphitheater Concerts*, 267 F.3d at 507.

Moreover, the Sixth Circuit has held that allegedly improper conduct in obtaining the information is insufficient to justify imposing a prior restraint.[8]  *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996).  Only when "publication [would] threaten an interest more fundamental than the First Amendment itself" is such a restraint justified.  *Id.* at 226-27.  Here, Plaintiffs' "interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint."  *Id.* at 225; *see also Ford Motor Co. v. Lane*, 67 F. Supp. 2d 745, 753 (S.D. Ohio 1999) ("In the absence of a confidentiality agreement or fiduciary duty between the parties, [the plaintiff's] commercial interest in its trade secrets and [the defendant's] alleged improper conduct in obtaining the trade secrets are not grounds for issuing a prior restraint.").

The Court **GRANTS** Defendants' Motion to Dismiss the declaratory-judgment claim.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Dismiss.  This case is **DISMISSED**.  The Clerk is directed to enter Judgment for Defendants.

**IT IS SO ORDERED.**

    s/ Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  June 17, 2016**

---

[8] And in any event, although Plaintiffs characterize Defendants as having committed a "perfectly-executed theft for resale" (Doc. 15 at 11), Plaintiffs' complaint does not actually allege that Defendants, rather than their sources, have violated any law or contractual provision.